RAINIER COMPANIES, INC. (FORMERLY SICKS' RAINIER BREWING CO.), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6870-71. Filed October 23, 1973.

*F. A. LeSourd*, for the petitioner.
*Richard J. Shipley*, for the respondent.

IRWIN, *Judge:* Respondent determined deficiencies of $270,262 and $34,564 in the income taxes of petitioner for the years 1966 and 1967, respectively. After concessions by the parties three issues remain for decision: (1) Whether petitioner's sale of its baseball stadium site to the City of Seattle was an involuntary conversion under threat of condemnation entitling petitioner to defer recognition of the gain under section 1033;[1] (2) whether petitioner's alleged donation of stadium improvements to the City of Seattle constitutes a charitable contribution under section 170; and (3) whether petitioner realized ordinary income of $5,000 under section 1245 upon transfer of personal property to the City in connection with the stadium sale.

### FINDINGS OF FACT

Petitioner is the Rainier Companies, Inc., a Washington corporation with its principal place of business at all relevant times in Seattle, Wash. During 1966 and 1967 petitioner was named Sicks' Rainier Brewing Co., and as such filed its corporate income tax returns for these years with the district director of internal revenue, Tacoma, Wash.

Petitioner or its subsidiary companies had owned the Sicks' Rainier Baseball Stadium since it was constructed in 1938. The stadium was used by the company's minor league baseball club, the Seattle Rainiers (a part of the Pacific Coast League), until about 1960. At that time the petitioner stopped operating its team and began leasing the stadium facilities to the Boston Redsox and later the Los Angeles Angels, both of whom conducted a minor league ball team in the stadium.

The decisions to cease operating a minor league team and to lease its stadium to a major league team were part of an overall change in policy made by petitioner in 1959. Although petitioner did not wish

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended.

to lose the goodwill with the Seattle community which was the result of its long association with professional baseball, petitioner realized that the stadium site was not being used profitably. Accordingly, petitioner decided to work toward getting out of the baseball business entirely and to try to find a way of using the stadium site more profitably without incurring the onus of being responsible for the end of professional baseball in Seattle.

The leasing arrangement did not prove satisfactory. In some years petitioner lost money leasing the stadium. For example, in 1965 petitioner received a net rental of only $17,500 from the Los Angeles Angels. As a result of the declining revenues from the lease of the stadium, in 1964 petitioner decided to either sell the stadium property or convert it to a commercial use. Consequently petitioner notified the Los Angeles Angels that it could not promise to lease the stadium beyond the 1965 baseball season. Petitioner also notified several local governmental authorities that it would be willing to cooperate if one of them took action to acquire the stadium for a public sports facility.

In addition to notifying local governmental bodies that the stadium property was for sale, petitioner also took part in negotiations with the Cleveland Indians, a major league baseball club, who were interested in considering a move to Seattle. In the fall of 1964 petitioner offered to lease its stadium to the Cleveland Indians for a net rental of $25,000 per year. This would have been the lowest rental paid by any major league club.

In December 1964 petitioner engaged the services of an independent group of land development consultants (Larry Smith & Co.) to make an alternative commercial use analysis report on the Sicks' Stadium site. This report was received in March 1965. The principal recommendation of the report was for a shopping center built around a Sears Roebuck retail store or a similar department store. The proposal was that petitioner either should build such a center or participate in a joint venture for the construction of such a center.

Following receipt of the Smith report recommendation for a shopping center built around a store such as a Sears Roebuck & Co. store as a major tenant, petitioner made a preliminary contact with Price Sullivan, a local manager for Sears, but he was doubtful about the project. The matter was never pursued with Sears beyond this point. Various other department stores were contacted and indicated an interest in the site.

At a meeting of petitioner's executive committee held on April 20, 1965, petitioner's president Alan Ferguson presented copies of the Smith report. Prior to receiving the report Ferguson had felt that the stadium site would have a value of $2 to $2.5 million after the

development of a shopping center; however, the Smith report indicated a high after-development value of $2 million with $1.5 million being a more realistic after-development value. Although the report indicated that commercial development of the stadium site was a feasible project for petitioner, Ferguson felt that at best the project was only an alternative to selling the property outright. In view of petitioner's lack of experience in real estate development and its long association with professional baseball Ferguson felt that sale of the land to the public was the most satisfactory alternative available. Accordingly, the directors of petitioner authorized its officers to offer the stadium site for sale to the City or County for $1,500,000.

The response of various city and county officials was not enthusiastic or encouraging. Neither jurisdiction had the funds available to purchase the stadium; but there was some possibility that public purchase of the stadium could be accomplished through the issuance of bonds, an act which would have required approval of the voters in the November 1966 election.

Plans for the stadium site progressed indifferently during the summer of 1965. Petitioner's officers continued to be in contact with local officials, and they had preliminary discussions with two discount chain stores concerning commercial development of the site. On July 26, 1965, the executive committee decided that final plans should be made for the property at a special meeting of the board of directors to be held on August 2, 1965. This date was chosen for a final decision because petitioner felt obligated to notify the Los Angeles Angels by the beginning of August 1965 whether the stadium lease would be renewed for the 1966 baseball season.

Reports of petitioner's various plans and proposals for the baseball park were carried in local newspapers. Melvin E. Wilson, who was a member of the Seattle Engineering Department's Geometric Design Section, became concerned when he learned of petitioner's August 2, 1965, final deadline with respect to the stadium site. At this time the Engineering Department was conducting preliminary route and design studies for the proposed R. H. Thomson Expressway. Construction of this highway was not anticipated for 10 to 15 years, and acquisition of land for the road was considered to be at least 5 years in the offing. The route of the road was proposed to be located near petitioner's baseball park or, perhaps, through a part of it. Wilson had previously talked to petitioner's president, Ferguson, in October 1964 about petitioner's plans for the stadium. At that time it did not appear likely that construction of the expressway would involve a significant portion of the stadium land; however, by the middle of 1965 further studies had indicated that the expressway would have more lanes than

previously considered and that a substantial part of the stadium site might be needed.

Although alternative routes for the expressway were under consideration which did not involve use of the stadium, Wilson hoped that he could persuade petitioner to extend its August 2, 1965, decision deadline with respect to the stadium so that the possibility of purchasing the property as an advanced right-of-way acquisition could be discussed. On July 30, 1965, Wilson requested a meeting with officials in the mayor's office in order to inform them of the status of the expressway project. As a result of this meeting Edward J. Devine, the mayor's public affairs assistant, got in touch with Ferguson. Devine told Ferguson that the City was prepared to act on acquiring the stadium well in advance of its previous plans. Devine also told Ferguson that the City might want to condemn a portion of the property some years in the future.

On the evening of July 30, 1965, Ferguson met with the mayor, who basically reiterated the points made by Devine earlier in the day. The mayor was of the impression the City's selection of route for the expressway was nearly complete and that a substantial portion of the stadium site would be required. Accordingly, he expressed his hope that the site could be acquired voluntarily from petitioner. Neither the mayor nor Devine nor any other official in local government stated to Ferguson that condemnation of the stadium site was in fact contemplated. Condemnation was mentioned by these officials as a possibility which might take place in the uncertain and not imminent future.

On August 2, 1965, the previously scheduled special meeting of the board of directors of petitioner was held. Ferguson reported the prior discussions of the executive committee and stated that the immediate decision was whether the lease of the stadium property should be renewed for another year from October 15, 1965, the date of expiration of the present lease. Other questions were whether the company should get out of baseball, should dispose of the property or consider alternate uses of the property. He stated that there had been threats of condemnation of a portion of the property to make way for the proposed R. H. Thomson Expressway. The consensus of the meeting was that the company should get out of baseball if at all feasible. The board then approved a suggested prepared press release which subsequently was issued to the press. This prepared statement read as follows, in part:

At the meeting of our Board of Directors just concluded we took action on behalf of our company's 2100 stockholders in a final effort to resolve this problem. While we cannot justify a lease commitment for the 1966 baseball season, and feel we must proceed with consideration of alternate uses of the property, we are

prepared to turn over both the land and the Stadium to the City, County or schools for the value of the land alone. The land on which Sicks' Stadium stands has an appraised value of approximately $1,150,000. While no appraisal of the Stadium building has been made recently, we estimate its replacement cost at close to $2,000,000. We are also prepared to consider a comparable "free stadium" offer from any responsible private party, provided that the purchaser would continue use of the facility for sports purposes. The condition of this proposal is that a firm offer must reach us by October 1, 1965. Failing such an offer we will be forced to complete negotiations for the development of the property for other purposes. We have withheld such conversations in the hope that one of our public bodies would step forward. Naturally, it has been disappointing to us that none of them has found it possible to do so. We are hopeful that this final action by our Board will lead to retention of the Stadium as a community sports facility.

On the same date, August 2, 1965, petitioner notified the Los Angeles Angels that the lease for the baseball park would not be renewed beyond the 1965 season.

The Engineering Department also prepared on September 24, 1965, an economic analysis of the feasibility of purchase of the stadium site as an advanced acquisition. The department recommended an acquisition of approximately 25 percent of the site as an advanced acquisition for highway purposes.

No actual steps toward condemnation of the stadium property were ever taken by the City of Seattle. Before a route can be legally established, various public hearings must be held and none of these hearings were ever held as to this section of the expressway. The route also required the approval of the State Highway Department and Bureau of Public Roads.

The recommendation of the Engineering Department as to this section of the expressway was finally published in a reconnaissance report dated January 1966; however, the mayor was aware of the recommendation as early as July 30, 1965. This reconnaissance report selected the route through the stadium but it also listed two other alternate routes.

Following petitioner's public offer of August 2, 1965, the petitioner and the City each had appraisals made of the land only of the stadium site. Each of these appraisals supported the proposed sale price of $1,150,000.

On October 11, 1965, petitioner sent a formal written offer to the City Council of Seattle in acordance with its public announcement of August 2. The offer was to sell the land for a price of $1,150,000 payable over 5 years. The same offer specified that the baseball stadium improvements with related personal property would upon consummation of the sale be "donated" by petitioner to the City. This offer was authorized and approved by resolution of petitioner's board of direc-

tors on November 19, 1965. By ordinance passed November 22, 1965, and approved November 26, 1965, the City of Seattle authorized the purchase of the stadium property.

The sale of the stadium property was consummated January 3, 1966. The land was conveyed by statutory warranty deed. On the same date a conveyance and bill of sale transferring to the City of Seattle the improvements upon the stadium property and the related personal property was executed by petitioner.

As of the date of sale the adjusted basis of petitioner in the stadium improvements was $47,150.

Subsequent to the sale of the stadium property by petitioner to the City of Seattle on January 3, 1966, the sum of $1,150,000 received by petitioner from the City was reinvested, within the time period allowable, in assets qualified for reinvestment under section 1033.

OPINION

Petitioner or one of its subsidiaries had owned Sicks' Stadium in Seattle since it was constructed in 1938, and it had also owned from that year until 1960 the baseball team that played there. In 1959 petitioner's management decided that it wanted to divest itself of the baseball business which had ceased to be profitable if it could accomplish the divestiture without incurring the wrath of the public. As a first step, petitioner began leasing the stadium to a major league team in 1960 for use by an affiliated minor league club; however, the return from the leases was not satisfactory.

In 1964 petitioner began to consider seriously the use of Sicks' Stadium for some purpose other than baseball. A group of independent land development consultants was employed to evaluate the potential of the stadium property as a site for a new shopping center. The report of the consultants was received by petitioner in March 1965 and indicated that the realistic developed value of the property might not exceed $1.5 million. Petitioner's president was disappointed by the commercial prospects for the property. Petitioner's directors felt that sale of the stadium to the City or County for recreation purposes might be a better alternative than commercial development because petitioner did not want to be responsible for the demise of professional baseball in Seattle and because petitioner was not experienced in real estate development. Accordingly, petitioner offered to sell the stadium to the City or County for $1,500,000.

The response to petitioner's offer was not enthusiastic or encouraging. There were no public funds available for purchasing the stadium, and it was believed that there were legal obstacles to placing a bond

issue for purchasing the stadium on the ballot. In view of the lack of favorable response by local officials petitioner continued preliminary inquiries with chain stores concerning the development of a shopping center and set a deadline of August 2, 1965, for a final decision on the property.

At the end of July 1965 Wilson, a member of the Seattle Engineering Department, learned of petitioner's impending deadline and became concerned that any development of the stadium might interfere with then-existing plans to construct an expressway. Although construction of the expressway was not contemplated for 10 years and normal acquisition of a right-of-way was at least 5 years away, Wilson felt that it might be advantageous for the City to make an advanced acquisition of the stadium land as the favored design of the highway incorporated a substantial part of the land. Wilson consulted with the mayor who in turn made contacts with petitioner.

After some negotiations petitioner and the City agreed that the City would purchase the stadium land for its appraised value of $1,150,000 and that petitioner would donate to the City the stadium improvements upon the land for use until the highway was constructed. The sale and donation were consummated in January 1966. In the course of their negotiations with petitioner's president, City officials did discuss the possibility of the need for condemning petitioner's land at some uncertain time in the distant future.

Petitioner challenges three determinations of respondent: (1) That the stadium property was not sold to the City under threat or imminence of condemnation; (2) that petitioner did not make a charitable contribution in donating the stadium improvements to the City; and (3) that petitioner realized $5,000 of ordinary income upon the transfer of personal property, including baseball equipment, to the City. We agree with respondent with respect to the first two determinations and with petitioner with respect to the third.

*Involuntary conversion.*—Section 1033 permits an owner of property to defer recognition of the gain from the sale of the property if the sale is made under threat or imminence of condemnation and if certain requirements as to reinvesting the sale proceeds are met. The parties have stipulated that the reinvestment requirements have been met but cannot agree that petitioner acted under threat or imminence of condemnation.

It is a well-known fact that local governments possess the power to condemn property for use in public projects. Accordingly, if mere knowledge that a local government entity possessed the power to condemn an owner's property was sufficient evidence of a threat of condemnation, then few sales of land to the public would fail to qualify

under section 1033. In this case we do not think that petitioner has shown much more than that it knew that the City might condemn the stadium.

This Court has been liberal in defining the term "threat of condemnation" as it is used in section 1033. Generally, we have been willing to find a threat if the taxpayer might reasonably believe from representations of government agents and from surrounding circumstances that condemnation was likely to take place if he did not sell his property. *Edward Warner*, 56 T.C. 1126 (1971), affd. 478 F. 2d 1406 (C.A. 7, 1973); *S. & B. Realty Co.*, 54 T.C. 863 (1970); *Frank O. Maixner*, 33 T.C. 191 (1959). On the other hand, we have been unwilling to find a threat where it should have appeared that the chance of condemnation was remote. *Edward Warner, supra.* We feel that this case is squarely within the second category.

Although it is true that both petitioner's president and the various local officials with whom he discussed the stadium sale felt that construction of the expressway would eventually require a significant part of petitioner's stadium property, no one actually stated that the land would be condemned if petitioner did not cooperate. Indeed, no such statement could have been made because the City had no plans to condemn any land for the highway, the highway was only in its design stages, public hearings and approval by the State Highway Department and the Bureau of Public Roads were necessary in selecting a final route, and several alternative routes for the road were still under consideration.

A realistic view of the negotiations between petitioner and the City appears to be that the City was merely enlisting the cooperation of petitioner with the knowledge that such cooperation probably would be forthcoming. Petitioner had been trying to interest the City and County in its stadium for over a year and was willing to consider an offer from a private party provided such party would continue the stadium as a sports facility. There is no evidence that petitioner was in any way compelled to sell the land by the remote possibility that the City would condemn its stadium. Petitioner had decided prior to the start of negotiations with the City that outright sale of the land was its best course of action in light of its inexperience in land development and its reluctance to bear the responsibility for ending professional baseball in Seattle. Petitioner's plans for developing the stadium site were hardly past the conjectural stage at the time of the sale. All through the summer of 1965 petitioner delayed making any final decision about the stadium while hoping that the City would find a way to accommodate its desire to sell the stadium. It was most fortuitous for petitioner that the City found a way to acquire the

property, and we do not think that the City's power to condemn had any effect on petitioner's decision to sell the land. Under these circumstances petitioner is not entitled to the benefits of section 1033.

*Charitable contribution.*—Under section 170(a) and section 170(c) (1) petitioner is entitled to a deduction for a contribution of property to or for the use of a city. Petitioner claims that it is entitled to such a deduction on two alternative theories. The first is that there was a donation of the stadium improvements in a transaction separate from the sale of the underlying land. The second is that, if the transfer of the land and stadium are viewed as a single transaction, then the transfer was a bargain sale with the bargain element constituting a contribution. Regardless of the theory employed, we believe that petitioner's claim fails because it did not make a contribution.

A contribution is synonymous with a gift, a voluntary transfer of property from the owner to another without consideration. *Larry G. Sutton*, 57 T.C. 239 (1971); *Harold DeJong*, 36 T.C. 896 (1961), affd. 309 F. 2d 373 (C.A. 9, 1962). In passing upon the section 1033 issue we noted that petitioner was quite anxious to rid itself of the stadium property. Accordingly, it is quite clear that petitioner intended the "free stadium" offer to the City as an inducement for its purchase of the land. The "free stadium" offer was also made to any private party that would continue use of the stadium as a sports facility. Petitioner was not primarily motivated by the satisfaction that might come from a generous act but from the benefits of selling the land. Because donative intent on petitioner's part is lacking, the value of any benefit bestowed upon the City, either through the "donation" of the stadium or through a bargain sale, cannot constitute a deductible charitable contribution. *Larry G. Sutton, supra.* See *Charles O. Grinslade*, 59 T.C. 566 (1973).

*Transfer of personal property.*—As an incident of the transfer of the stadium to the City, petitioner also transferred certain personal property including some baseball equipment. This equipment was section 1245 property and had a zero basis. Petitioner took no charitable deduction for this equipment because the amount of the deduction would have been reduced to zero under section 170(e). Respondent determined that the transfer of the equipment was a disposition of the equipment and that petitioner realized ordinary income under section 1245(a)(1) equal to the fair market value of the equipment.

Section 1245(b)(1) excepts dispositions by gift from the operation of section 1245(a). Although we have held that the transfer of the stadium was not a gift, we believe that petitioner did intend to make a gift of the personal property. The transfer of this property was not held out as an inducement for the City to enter into the stadium deal,

and it was not part of the assets over which the parties bargained. The consummation of the stadium sale no doubt encouraged petitioner to make a gift of the property, but we do not think that petitioner expected any reward or benefit for making the gift that it would not have otherwise received. Accordingly, we hold that petitioner did not recognize any ordinary income under section 1245(a) as a result of its transfer of the equipment.

*Decision will be entered under Rule 50.*