JOSEPH P. BALISTRIERI, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Balistrieri v. Commissioner
Docket No. 7681-74, 7700-75, 8635-76.
United States Tax Court
T.C. Memo 1979-115; 1979 Tax Ct. Memo LEXIS 406; 38 T.C.M. (CCH) 526; T.C.M. (RIA) 79115; March 29, 1979, Filed James M. Shellow and James R. Glover, for the petitioner. James F. Kidd, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax for the calendar years 1970, 1971 and 1972 in the amounts of $141,814.58, $5,378.83 and $6,758.67, respectively, and an addition to tax under section 6651(a)(1), I.R.C. 1954, [1] in the amount of $240.83 for failure to timely file a return for the calendar year 1972. Most of the issues raised by the pleadings have been disposed of by the parties, leaving for our decision only whether property owned by petitioner, which was located at 720-722 North Water Street, Milwaukee, Wisconsin (the Kings IV), was compulsorily or involuntarily converted as a result of threat or imminence of condemnation within the meaning of section 1033(a). The parties agree that property purchased by petitioner known as the Shorecrest Hotel is similar or related in service to the Kings IV property, and in disposing *408 of other issues have agreed that the amount initially paid by petitioner for the Kings IV property was $80,000, and that capital improvements as claimed by petitioner were made to the property. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, an individual who resided in Milwaukee, Wisconsin at the time of the filing of his petition in this case, filed a Federal income tax return for the calendar year 1970 with the District Director of Internal Revenue, Milwaukee, Wisconsin. Petitioner is an attorney whose practice is primarily in the field of litigation, particularly in the area of criminal law. On September 15, 1967, petitioner purchased the Kings IV property located at 720-722 North Water Street, Milwaukee, Wisconsin for a price of $80,000. After the acquisition of this property, petitioner leased the premises to lessees who operated a night club and a restaurant.When petitioner first purchased the Kings IV property the building was in bad physical shape -- it listed and had to be straightened. The building reguired structural as well as architectural remodeling. Because of the remodeling necessary, petitioner refinanced *409 the building. Most of the properties in the area in which the Kings IV was located housed financial institutions such as banks or savings and loan associations, or contained offices of accounting firms or lawyers. When petitioner purchased the property he planned to put an English-style pub on the first floor and law offices on the second, third and fourth floors. After this plan was completed, petitioner planned to name the building the Balistrieri Building in honor of his grandfather who had immigrated to this country from Sicily. Prior to the sale of the building, petitioner had converted the first floor to an English-style pub and the second floor to a sit-down restaurant. He had not completed his plans to convert the vacant fourth floor into law offices for himself and the third floor into space to be rented to other attorneys, but was still planning this conversion of the third and fourth floors. Petitioner hoped that his brother, who was then in law school, would join him in the practice of law and share his offices on the fourth floor of the Kings IV. The third floor, at the time of the sale of the building, was being used as a showroom, and the fourth floor was vacant. *410 Petitioner encountered a number of difficulties in his effort to remodel the Kings IV property. He had difficulty getting certain building permits and a license for the English-style pub. At one point he was indicted by a Federal Grand Jury for conspiracy with his tenants to defraud the United States in the purchases of liquor stamps, but the charges were dismissed. Petitioner eventually completed most of the remodeling but the building was not a financial success. The business of the tenants renting the bar and restaurant was not successful and petitioner was looking for another tenant. Because of petitioner's failure to obtain the amount of rental he had expected from the first two floors of the building and his not having completed the two top floors to be rented for the purposes he intended, he was encountering difficulties in meeting the mortgage payments on the building and other indebtednesses in connection with the building. A number of persons expressed an interest in purchasing the Kings IV. An individual from Chicago, who stated to petitioner that he was representing the Playbody Club, attempted to get an offer from petitioner to take to his principals, but petitioner *411 told this individual that he did not want to sell the building. He said that he would consider a lease of the property. Sometime prior to June 24, 1970, and around the time petitioner was approached by the man from Chicago, a Mr. Vogt approached petitioner with respect to the purchase of the building. Mr. Vogt was an officer of First Federal Savings and Loan Association (First Federal). Mr. Vogt did not state to petitioner why he wished to purchase the building, but when petitioner told him that he was not interested in selling the building he suggested to petitioner that he might arrange a trade of petitioner's building for the Belmont Hotel on 4th and Wells or the Bank of Commerce building next door to the Belmont Hotel building. Petitioner stated to Mr. Vogt that he was not interested in such an exchange. In petitioner's opinion the Belmont Hotel did not have the type of reputation he desired in a building he owned. The Bank of Commerce building was of a classical architectural design with columns. At the time of the trial of this case in March 1978, that building had been torn down. Although petitioner was not aware of the fact at the time he was first approached by *412 Mr. Vogt, First Federal was attempting to acquire all the property in the block on which the Kings IV was located in order to build the First Federal Plaza. At the time Mr. Vogt first approached petitioner, First Federal was also attempting to acquire the Bankers Building and certain other property needed for its intended project. The negotiations to purchase the Bankers Building were being carried on by Mr. Robert Brown who at the time was president of First Federal. Initially, Mr. Brown did not get involved in First Federal's efforts to purchase the Kings IV property except that he and the chief appraiser of First Federal did examine the premises to determine their idea of the value of the property. The objective of First Federal was to acquire the property for as small an amount as it could. The first conversation that Mr. Brown had with petitioner was when petitioner called him on the telephone and stated he wished to talk with him. They arranged a meeting, and at the meeting petitioner told Mr. Brown that he did not want to have Mr. Vogt negotiate with him anymore. In the meantime First Federal had been successful in acquiring the Bankers Building and other property in *413 the block in which the Kings IV property was located. When the closing took place on the Bankers Building, the Milwaukee Journal ran a picture in the newspaper and an article stating that the Kings IV property was the only property in the block bounded by Water Street on the west, Wisconsin Avenue on the south, Broadway on the east and Mason Street on the north which First Federal did not own. On June 24, 1970, First Federal made a written offer to petitioner to purchase the Kings IV property for $300,000. This offer included certain provisions for the payment of rent to First Federal after the closing and provided that First Federal acquire for the stated sales price, in addition to the building, some large fixtures such as the elevator and all air conditioning equipment and draperies. When petitioner did not accept its June 24, 1970, offer, First Federal submitted on or about July 2, 1970, a second offer to petitioner increasing the proposed sales price to $400,000. Petitioner also declined to accept this offer. Petitioner's brother and his father, as well as several of his friends, urged petitioner to sell the Kings IV property in order to pay all the indebtednesses he *414 had incurred in remodeling the property. The Kings IV had a reputation as a good property and was in a good area. On or about August 24, 1970, Mr. Brown approached a lawyer, Mr. Gregory Gramling, who had offices on the same floor as the executive offices of First Federal, and stated to him that he had heard that the Kings IV property had been sold. Mr. Brown expressed to Mr. Gramling a considerable amount of disappointment over the fact, stating that First Federal would have been willing to negotiate to purchase the property. Mr. Brown mentioned to Mr. Gramling a figure that he understood had been the sales price of the Kings IV property. Mr. Gramling stated to Mr. Brown that he had not heard that the property was sold and that he was surprised to hear that it had been. Mr. Brown then stated to Mr. Gramling that since Mr. Gramling was acquainted with the people who ran the Kings IV, he would appreciate Mr. Gramling's finding out for him what the situation with respect to the property was. After Mr. Brown first talked to Mr. Gramling, Mr. Gramling inquired of petitioner's father as to whether the Kings IV had been sold and was informed by petitioner's father that it had not *415 been sold. Thereafter he again encountered Mr. Brown and told Mr. Brown that he had found out that the Kings IV had not been sold.Later, Mr. Brown asked Mr. Gramling whether he would make an effort to find out if the Kings IV property could be purchased by First Federal since First Federal was extremely interested in acquiring the property. Mr. Gramling then talked to petitioner in an effort to find out whether petitioner would be agreeable to entering into negotiations with First Federal with respect to the sale of the building. Petitioner told Mr. Gramling nothing about any previous discussions he had had with Mr. Vogt or any offer from First Federal to purchase the building. Petitioner told Mr. Gramling that he was not enthusiastic about a sale to First Federal but that Mr. Gramling could go ahead on an exploratory basis to find out how interested First Federal was in the purchase of the building. At that juncture, Mr. Gramling became concerned about who he represented with respect to the purchase or sale of the Kings IV. Later, in a further discussion with petitioner, Mr. Gramling received an indication that petitioner preferred that Mr. Gramling represent him if he was *416 to look into a possible purchase of the building by First Federal. When Mr. Gramling communicated this information to Mr. Brown, Mr. Brown was agreeable to having discussions on that basis. After several discussions between Mr. Gramling and Mr. Brown, Mr. Brown told Mr. Gramling about the plans of First Federal for developing the entire block on which the Kings IV building stood and his desire to acquire the Kings IV property to enable First Federal to proceed with its plans. Mr. Gramling then proceeded to attempt to find out on what basis First Federal was willing to purchase the Kings IV property and to find out on what basis, if any, petitioner would be interested in selling the property. Neither party would name a price and petitioner evidence no enthusiasm about selling the property, even though Mr. Brown did indicate to Mr. Gramling his desire to acquire the property. Mr. Gramling had a number of discussions with Mr. Brown with respect to terms of the sale of the Kings IV property, such as a provision that the sale not include fixtures and personal property and the possibility of a mortgage commitment from First Federal to enable petitioner to acquire another building. Initially, *417 Mr. Gramling did not discuss the negotiations he was having with Mr. Brown with petitioner, but sometime in October he did discuss these negotiations with petitioner, and petitioner evidence no enthusiasm for selling the building. In late October, when Mr. Gramling reported to Mr. Brown that he thought First Federal had not made an offer which would be an inducement to petitioner to sell, Mr. Brown stated to Mr. Gramling that if petitioner was going to be unreasonable about selling the property to First Federal, First Federal was going to see what it could do to condemn the property. When Mr. Gramling inquired as to how Mr. Brown planned to condemn the property, Mr. Brown stated that First Federal might form some type of urban renewal condemnation area, which was permitted under Wisconsin statutes. Mr. Brown made reference to Marquette University being able to condemn property under certain of these statutes. Although Mr. Gramling's legal practice had to a large extent been in condemnation work, he had no experience in the area of urban renewal or municipal condemnation. He therefore did some research in order to form an opinion as to whether First Federal was in a position to *418 take any action to have a condemnation procedure initiated. Based on this research and his interpretation of the Wisconsin statutes, Mr. Gramling formed the opinion that it was likely that First Federal might be able to form an urban renewal project and have the Kings IV property condemned. At this juncture, Mr. Gramling talked with petitioner and told him about his conversation with Mr. Brown. He further told petitioner that in his opinion, based on some research he had done, it was possible for First Federal to initiate a condemnation of the Kings IV property. He further told petitioner that in his opinion, based on his experience with condemnation, the initiation of such a procedure would have an adverse effect on the value of petitioner's property and that the contesting of a suggested fair market value of a piece of real estate in a condemnation action was a long and costly process. After his discussion with Mr. Gramling as to the likelihood of First Federal being able to obtain condemnation of the Kings IV property, petitioner discussed the provisions of Wisconsin law as to condemnation for urban development with two other attorneys who were friends of his. Each of these *419 attorneys advised petitioner that, in his opinion, First Federal could obtain the Kings IV property through condemnation of the property by the city under an urban development plan and that, in his opinion, it would do so. One of these attorneys pointed out to petitioner how property in the Third Ward of the city had been condemned by the city and turned over to private developers for urban redevelopment. Between August 24, 1970, and the first of November 1970, Mr. Gramling had discussed the possible purchase of the Kings IV building by First Federal with Mr. Brown at 20 to 35 informal meetings. Some of these meetings were merely short encounters in the hallway of the building in which they both worked and others were longer meetings. Prior to Mr. Brown's mentioning to Mr. Gramling that First Federal was going to attempt condemnation of the Kings IV property, one of the members of the board of directors of First Federal had suggested to the board and Mr. Brown that First Federal try to have the city condemn the Kings IV property for First Federal. Mr. Brown asked the attorney for First Federal, Mr. Werner, to look into the matter of having the city condemn the Kings IV property *420 for First Federal. Mr. Werner had been at the board meeting in October when the suggestion had been made that First Federal consider urban redevelopment, thereby having the city acquire the Kings IV property for it by condemnation. Shortly after this board meeting, probably on November 1 or 2, Mr. Brown wrote a memorandum to Mr. Werner requesting him to take steps to acquire the Kings IV property through the city by urban redevelopment. Mr. Werner looked up the law with respect to the condemnation of property for urban development programs and made some handwritten notes. At about the same time, perhaps on the morning of November 2, Mr. Brown called Mr. Werner into a conference with Mr. Gramling and had him take notes on a proposed offer to purchase the Kings IV property to be submitted to petitioner. On November 2, Mr. Werner wrote a letter to Mr. John Fleming, the Milwaukee city attorney, regarding the condemnation of the property by the city for use of First Federal in a redevelopment program. This letter was entitled "RE: Condemnation under sec. 66.414 Wis. Stats." The body of the letter was as follows: First Federal owns most of the block bounded by North Water Street, *421 East Wisconsin Avenue, North Broadway and East Mason. Kings IV located at 720 North Water Street is the only property at the southern end of the block not owned by First Federal. We believe, that the future redevelopment of this block in accordance with the objectives set forth in the Urban Redevelopment Section of the Wisconsin statutes will be best accomplished by First Federal ownership. The Kings IV building is uneconomic and interferes with plans for redevelopment of the southern end of said block. It is our desire to have the City initiate condemnation proceedings against the Kings IV property. Before we take further steps, however, we would appreciate your opinion as to whether the City would give favorable consideration to proceeding with the proposed condemnation. Shortly after sending this letter, probably around November 5 or 6, Mr. Werner ran into Mr. Gramling. Mr. Werner told Mr. Gramling that he had sent a letter to Mr. Fleming, the attorney for the city, for the purpose of instituting condemnation proceedings for Kings IV. Mr. Gramling asked Mr. Werner to send him a copy of his letter to Mr. Fleming. A copy of Mr. Werner's letter to Mr. Fleming came into the *422 possession of Mr. Gramling and petitioner.
Under date of November 6, 1970, Mr. Mark Ryan, a Milwaukee alderman and chairman of the Committee on Buildings-Grounds-Harbors, responded to Mr. Werner's letter. The body of the response was as follows: Your letter of November 2nd to the City Attorney has come to my attention concerning condemnation under Section 66.414 Wisconsin Statutes.
As you know, the city has in the past condemned under certain portions of the State Statutes, and I would assume that if a proper development were proposed and you chose to use this means of achieving the ownership of the land, that we certainly would be receptive to a proposal from your group. You understand, however, that nobody but the Common Council can make the final decision; and therefore there would be no way of projecting at this time the actual outcome of your request. Petitioner and Mr. Gramling also had copies of Mr. Ryan's reply to Mr. Werner's letter. The office of the city attorney was not in a position to respond to Mr. Werner's letter of November 2, 1970, to Mr. Fleming since proceedings with respect to condemnation for urban renewal purposes have to be commenced by directive *423 of the Common Council of the City of Milwaukee, and for this reason Mr. Fleming had referred the letter to Mr. Ryan. Part of the deliberation of the committee which Mr. Ryan chaired was with respect to condemnation of property pursuant to urban renewal or urban development programs. Mr. Ryan always encouraged any proposed urban development in the downtown Milwaukee area. If the initial inquiry was followed up with a proposal, the proposal would receive a file number by the Department of City Development, be brought before the Common Council and referred to the full committee which Mr. Ryan chaired. The Common Council encouraged proposals by substantial business organizations such as First Federal for urban development projects in the downtown area of Milwaukee. The Department of City Development of Milwaukee did not receive notice, open a file or otherwise take any action with respect to a proposed condemnation of the Kings IV. Mr. Gramling, after seeing Mr. Werner's letter to Mr. Fleming, prepared a proposed contract along the lines that he considered he had worked out with Mr. Brown for the purchase by First Federal of the Kings IV property from petitioner. The proposed *424 contract provided that Mr. Gramling's fee be paid by First Federal, the elimination of the air conditioning equipment as part of the fixtures to be acquired by First Federal with the purchase of the building, the assumption by First Federal of the payment of taxes for the entire year and petitioner's rentfree possession of the property for a period of up to 24 months. As part of the consideration for the purchase of the Kings IV property, First Federal agreed to give petitioner a mortgage commitment of up to $950,000, good for one year from the date of the commitment.The purchase price paid for the Kings IV building by First Federal was $602,634. The contract for sale of the building was signed on November 11, 1970, by First Federal and petitioner. There had been a condemnation effected by the City of Milwaukee during the 1960's under Wisconsin Statute 66.43, Blighted Area Act, on behalf of Marquette University. It took Marquette University approximately 5 years from the time it submitted a formal plan under its urban renewal proposal to the time it acquired the first parcel of land under the project, and a period of at least another 5 years before it completed acquisition of *425 all the parcels to be condemned under its proposal. There had been no condemnation under Wisconsin Statute 66.414 under which First Federal had suggested the Kings IV property be condemned for its use by the City of Milwaukee since at least 1965. There had been condemnation with respect to property in the Third Ward of the City of Milwaukee effected under the Blighted Area Act. The front of the Kings IV property measures approximately 30 feet and its depth approximately 120 feet. At the time of the trial of this case, First Federal had completed the First Federal Plaza which encompassed the entire block on which the Kings IV had previously stood. Petitioner, on his Federal income tax return for the year 1970, reported a long-term capital gain of $390,431.83 on the sale of the Kings IV property computed as follows: Sales Price
$602,634.00
Cost
$136,126.33
80,954.00
217,080.33
Less Depreciation
Allowed
(4,878.16)
(212,202.17)
Gain
$390,431.83
Immediately following the computation of this profit was the statement-- The proceeds are from a sale resulting from condemnation and qualify for deferment under IRC 1033 *426 . Respondent in his notice of deficiency to petitioner increased petitioner's reported income by $263,685.58 with the following explanation: It has not been established that the gain from the sale of property at 722 N. Water Street, Milwaukee, Wisconsin, also known as Kings IV, qualifies for nonrecognition under the provisions of section 1033 of the Internal Revenue Code of 1954 as amended. Accordingly, the gain of $263,685.58, * * *, from the sale of the property has been included in your taxable income. [2]
OPINION Section 1033(a)[3] provides that when property is compulsorily or involuntarily converted by condemnation or threat or imminence thereof into money, no gain shall be recognized if the taxpayer within a period *427 of 2 years after the year of such conversion purchases property similar or related in service for the purpose of replacing the converted property. The parties here agree that petitioner, within the time specified in section 1033(a), purchased, as a replacement for the Kings IV, property similar or related in service or use to the Kings IV. The only area of disagreement is whether the conversion of the Kings IV was compulsory or involuntary within the meaning of section 1033(a). The record here shows that the Kings IV was not condemned and that no condemnation proceedings were begun. The petitioner's position is that his sale of the Kings IV to First Federal was under threat of condemnation. *428 It is now settled that if the sale is under threat of condemnation the conditions of section 1033 may be met by a sale to a third party rather than to the entity with the power of condemnation. S & B Realty Co. v. Commissioner,54 T.C. 863, 870 (1970); Creative Solutions, Inc. v. United States,320 F. 2d 809-811 (5th Cir. 1963). Also, as pointed out in Rainer Companies, Inc. v. Commissioner,61 T.C. 68, 76 (1973), we have been liberal in defining the term "threat of condemnation" as used in section 1033 and generally-- have been willing to find a threat if the taxpayer might reasonably believe from representations of government agents and from surrounding circumstances that condemnation was likely to take place if he did not sell his property. * * * It is also clear that the use of the word "threat" indicates that the statute does not require that there be a certainty of condemnation absent the sale. Ranier Companies, Inc. v. Commissioner,supra at 86. Essentially, the issue is a factual one of whether it is *429 reasonable for the owner of the property to infer from the statements made to him that the threat to take the property could and would be carried out if he does not sell the property. See Maixner v. Commissioner,33 T.C. 191, 195 (1959). As respondent now recognizes in Rev. Rul. 74-8, 1974-1 C.B. 200, where there are no reasonable grounds to believe that the person indicating to the seller that his property will be condemned if the sale is not made might not readily obtain the power to condemn the property, the sale is made under threat of condemnation if sold because of such statement even though the person making the statement did not at the time the statement was made have the legal power to condemn. Under Wis. Stat. sec. 66.405 through sec. 66.425, known and cited as the "Urban Redevelopment Law," it is clear that a municipality may condemn property for a private redevelopment corporation carrying out a redevelopment plan approved by the proper authority of the municipality where it is in the public interest that a substandard or insanitary area be redeveloped. *430 In fact, Wis. Stat. sec. 66.405(2) in the declaration of necessity specifically states that-- it is desirable to encourage owners of property or holders of claims thereon in such areas to join together and with outsiders in corporate groups for the purpose of the clearance, replanning, rehabilitation and reconstruction of such areas by joint action; * * * The Wisconsin Urban Redevelopment Law is somewhat similar in its provisions to the Blighted Area Act of Wisconsin, Wis. Stat. sec. 66.43. The Wisconsin Blighted Area Act (Wis. Stat. sec. 66.43(6)(a)) provides that after a city shall have assembled and cleared property in a blighted area it may sell such property to a redevelopment company or to an individual or partnership for use in accordance with the redevelopment plans. In David Jeffrey Co. v. City of Milwaukee,66 N.W.2d 362, 376-378 (Wis. Sup. Ct. 1954), the provisions of the Wisconsin Blighted Area Act allowing transfer of condemned property to private corporations or individuals for redevelopment was upheld. The Court held that the provisions for condemnation of private property for transfer under the Blighted Area Act (Wis. Stat. sec. 66.43) to private *431 corporations, partnerships or individuals for redevelopment in accordance with a plan approved by the city did not contravene any provisions of the constitution of the State of Wisconsin or the United States. It is clear under the provisions of Wis. Stat. sec. 66.405(3)(a) of the Urban Redevelopment Law that where a portion of the city has been found by the proper authority to be substandard or insanitary so that the clearing, replanning, rehabilitation or reconstruction there is necessary or advisable, the area-- may include any buildings or improvements not in themselves substandard or insanitary, and any real property, whether improved or unimproved, the inclusion of which is deemed necessary for the effective clearance, replanning, reconstruction or rehabilitation of the area of which such buildings, improvements or real property form a part; * * * A comparable provision of Wis. Stat. sec. 66.43, the Blighted Area Act, was held to permit the city to condemn "unoffending buildings" within the area where it is necessary for the clearance and redevelopment of the area or where such buildings are "incidental" to the clearance or redevelopment of the area. State v. Circuit Court of Milwaukee County,88 N.W. 2d 339 (Wis. Sup. Ct. 1958). *432 Petitioner argues that his reason for selling the Kings IV to First Federal was his belief, based on the advice he received from three attorneys knowledgeable in condemnation work, that under the Urban Redevelopment Law First Federal could readily obtain the power to have his property condemned. Petitioner argues that this was a reasonable belief even though First Federal had not submitted the plan required to be submitted under the Urban Renewal Act or obtained approval of an urban redevelopment plan, which was necessary before property could be condemned under the Urban Renewal Act. [4]
Respondent takes the position that even though "First Federal did in a sense 'threaten' that it would try to get petitioner's property condemned," such condemnation was a remote possibility insufficient *433 to constitute a threat or imminence of condemnation under section 1033. Respondent argues that had petitioner made adequate inquiry he would have learned that "he could have stalled First Federal's proposed condemnation indefinitely." Respondent recognizes that under his Rev. Rul. 74-8, supra, there can be a valid threat of condemnation where the party making the threat does not have the power of condemnation, provided that such power is readily obtainable. Respondent argues, however, that the power of condemnation could not have been obtained by First Federal itself and that the property could have been obtained for First Federal through condemnation by the city only under Wis. Stat. sec. 64.414, which was a long and involved process. Respondent argues that there is no evidence in this record that there has ever been a condemnation under Wis. Stat. sec. 66.414 and that the record shows that there had not been a condemnation in Milwaukee under this section since 1965. Respondent, in part, bases his argument of the long and involved process of condemnation for urban redevelopment purposes on the experience of Marquette University in obtaining property for redevelopment *434 under the Blighted Area Act. Respondent argues that petitioner could have ascertained how long a process it was for Marquette to obtain all the property needed for its redevelopment plan under the Blighted Area Act. Petitioner contends that since First Federal owned all other property in the block in which the Kings IV was located, the process of obtaining condemnation of one property would not necessarily have been long and involved. Petitioner contends that a procedure to obtain the condemnation of one piece of property cannot be compared to that used to obtain many different individual properties as was the case in the area developed by Marquette University.
Basically, the issue here is a question of fact. From all the evidence we must determine whether petitioner had a reasonable belief that his property would be condemned by the City of Milwaukee if he refused to sell it to First Federal and for this reason made the sale. Petitioner argues that had the Kings IV become the subject of a condemnation proceeding, the matter would have been public knowledge with the result that he would have had difficulty in obtaining the funds he needed to complete the remodeling of the property *435 and difficulty in obtaining proper tenants for the building.Petitioner testified that he did reasonably believe that First Federal could have the Kings IV condemned for its urban renewal project. He argues that under the Wisconsin Urban Redevelopment Law the city was in effect merely a conduit of the property since the property was condemned by the city to be turned over to a private corporation or individual for urban redevelopment. Petitioner argues that First Federal could have in substance readily obtained the power to condemn his property. Two attorneys involved in condemnation work in Milwaukee testified that on the basis of their research and knowledge they advised petitioner that First Federal could have his property condemned. Considering the evidence in this record as a whole, we conclude that petitioner did have a reasonable belief that if his property was not sold to First Federal it would be condemned and in the interim, while attempting to contest the condemnation, he would be unable to make effective use of the property. Respondent makes much of the fact that Mr. Gramling testified that he advised petitioner that because there existed a threat of condemnation of *436 the Kings IV petitioner could sell the property to First Federal, reinvest the proceeds in similar property and defer the tax on the gain realized on the sale. In our view, while this advice to petitioner from Mr. Gramling might have had some affect in persuading petitioner to accept the offer First Federal was making him for the property pursuant to negotiations Mr. Gramling had undertaken with representatives of First Federal, it does not require a conclusion that petitioner did not in fact reasonably believe that his property would be condemned if he did not accept First Federal's offer. We decide the only issue presented to us for petitioner. However, because of other issues disposed of by agreement of the parties, Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless other-wise stated.↩
2. The parties have now agreed to the correct cost of improvements increasing petitioner's basis in the building and the correct amount of depreciation to be deducted from the cost of the building plus improvements. The only remaining issue is whether the gain from the sale of the property qualifies for nonrecognition under section 1033↩.
3. Section 1033(a) provides in part as follows: SEC. 1033. INVOLUNTARY CONVERSIONS. (a) General Rule.--If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted-- (1) Conversion into similar property.--Into property similar or related in service or use to the property so converted, no gain shall be recognized. (2) Conversion into money.--Into money or into property not similar or related in service or use to the converted property, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph: (A) Nonrecognition of gain.--If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. Such election shall be made at such time and in such manner as the Secretary may by regulations prescribe.For purposes of this paragraph-- (i) no property or stock acquired before the disposition of the converted property shall be considered to have been acquired for the purpose of replacing such converted property unless held by the taxpayer on the date of such disposition; and (ii) the taxpayer shall be considered to have purchased property or stock only if, but for the provisions of subsection (b) of this section, the unadjusted basis of such property or stock would be its cost within the meaning of section 1012. (B) Period within which property must be replaced.-- The period referred to in subparagraph (A) shall be the period beginning with the date of the disposition of the converted property, or the earliest date of the threat or imminence of requisition or condemnation of the converted property, whichever is the earlier, and ending-- (i) 2 years after the close of the first taxable year in which any part of the gain upon the conversion is realized, or (ii) subject to such terms and conditions as may be specified by the Secretary, at the close of such later date as the Secretary may designate on application by the taxpayer. Such application shall be made at such time and in such manner as the Secretary may by regulations prescribe.↩
4. We note that one of the lawyers listed as "for respondent" in State v. Circuit Court of Milwaukee County,88 N.W. 2d 339↩ (Wis. Sup. Ct. (1958), was a witness in this case who testified that he, based on his experience in condemnation cases, advised petitioner that in his opinion First Federal could have the city condemn the Kings IV for its use in a redevelopment project.