815 RIVERSIDE COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
815 Riverside Co. v. Commissioner
Docket No. 29835-84.
United States Tax Court
T.C. Memo 1987-524; 1987 Tax Ct. Memo LEXIS 519; 54 T.C.M. (CCH) 886; T.C.M. (RIA) 87524; October 7, 1987. *519 Petitioner's property was leased by the City of Macon for use as a bus terminal from March 1973 until October 1975 when the property was purchased by the Macon-Bibb County Urban Development Authority. Held, petitioner's property was not sold under threat or imminence of condemnation and petitioner is not entitled to defer its gain under sec. 1033. Milford B. Hatcher, Jr., for the petitioner. Julie M. T. Walker, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined deficiencies in petitioner's Federal income tax for the fiscal years ending March 31, 1973, and March 31, 1976, in the respective amounts of $ 11,477.94 [1] and $ 128,625.38. The sole issue is whether petitioner sold certain real property located at 815 Riverside Drive in Macon, Georgia, under threat or imminence of condemnation so that petitioner may defer its gain on the sale under section 1033. [2] *520 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and attached exhibits are incorporated herein by this reference. At the time its petition was filed, petitioner was a corporation organized and existing under the laws of the State of Georgia with its principal place of business in Macon, Georgia. The majority of petitioner's stock was owned by A. Emmett Barnes, (Barnes) who was also the majority shareholder of Bibb Transportation Company (BTC). BTC had been operating a public bus transportation system in Macon since May 1949. BTC's headquarters and bus terminal were located on the property owned by petitioner at 815 Riverside Drive. BTC leased the property from petitioner until the property was sold to the Macon-Bibb County Development Authority (Authority) on October 16, 1975. On November 23, 1971, BTC informed the City of Macon (City) that it would terminate its franchise agreement with the City and cease operation of the bus line after December 31, 1972, due to the increasing financial losses from the continued operation of the bus line. Faced with losing bus service, and desiring to foster *521 economic growth in the area, Macon's mayor, Ronnie Thompson, and the city council (Council) set out to find the most feasible alternative. To this end, Mayor Thompson asked the City's attorney, Lawton Miller, to draft the necessary documents to create a Macon Transit Authority. On December 19, 1972, an ordinance was passed which amended the City charter to allow operation of a public transit system. On March 14, 1972, the Council passed a resolution asking the Governor of Georgia to include in a special session of the Georgia legislature a bill necessary to establish a Macon Transit Authority. The Macon Transit Authority Act was enacted by the Georgia legislature on April 17, 1973. As part of its powers and duties, the Macon Transit Authority was given the power of eminent domain. On January 1, 1973, BTC ceased operating a bus system in Macon despite the desire of the Council, expressed in a resolution, that Mayor Thompson sign a contract with BTC for continuation of service. Mayor Thompson had vetoed the resolution on the grounds that he did not want the City subsidizing private enterprises. His veto was sustained by the Council with the result that the City was without bus *522 service for the first 2 weeks of January 1973. However, at about the same time, the State of Georgia awarded the City a $ 25,000 grant to subsidize a pilot mass transportation study. Although Mayor Thompson and several members of the Council still had qualms about subsidizing private enterprise, the City entered into an oral agreement with BTC on January 15, 1973, under which BTC would operate the buses on a 60-day trial basis. On February 26, 1973, the City purchased property off Poplar Street in Macon as a potential site for a bus terminal. The City paid $ 135,000 for the site which it sold in November 1973 having determined that the site was not suitable for a bus terminal. The Council also had under consideration a site at Oglethorpe, Hazel and First Streets, which required a new building at an estimated cost of $ 1.3 million. This idea was abandoned as cost prohibitive. In order to continue bus service past the 60-day trial period, the Council, on February 28, 1973, approved the purchase of almost all of BTC's rolling stock and personal property for $ 260,000. The Council also approved leasing BTC's business premises for $ 3,000 per month. The City then took over operation *523 of the bus line. Having decided that the two alternative sites were not feasible, the Council set its sights on the purchase of petitioner's property. This was determined to be the most feasible site due to its anticipated cost and the fact that the premises were already equipped in the desired manner. The Council procured separate appraisals of the buildings and land which set the total value of the premises at $ 700,000. After being informed of these appraisals, petitioner's board of directors met and authorized Barnes to offer to sell the property to the City for $ 650,000. This offer was made by letter of March 14, 1974. Petitioner's initial offer to sell was rejected by the City, and subsequent negotiations between Barnes and City officials reduced the price to $ 612,500. Mayor Thompson sent a letter of intent to this effect to Barnes on March 27, 1974, in which it was agreed that the property would be sold for cash within 90 days; the City to rent the premises for that period of time for $ 6,000 per month. Mayor Thompson further pledged the City's help in getting Barnes a favorable mortgage rate for purchasing replacement property. The City did not comply with the letter *524 of intent since the Council decided to apply for funds under the Federal Mass Transportation Program. The shareholders of BTC and petitioner were informed of this fact on May 2, 1974. The City continued to rent the premises from petitioner for $ 6,000 per month. Although the City continued to pursue Federal and state financing for the purchase of petitioner's property, the Council had not yet finally decided to consummate the purchase. Recognizing the tentative nature of the sale, Barnes cautioned petitioner's other shareholders against putting any pressure on the City that might result in the City's unwillingness to purchase the property at all. On October 23, 1974, the City gave petitioner $ 30,000 for a purchase option on the property. The Option Agreement dated October 29, 1973, made clear that this deposit was in all events nonrefundable. The option itself was exercisable on or before March 31, 1975. However, by letter dated October 23, 1974, the City unilaterally extended the period during which the option was open to June 30, 1975, in the event that Urban Mass Transportation Act (UMTA) financing was not forthcoming. Petitioner made no objection to this extension. Should *525 the City desire to extend the option past March 31, 1975, the monthly rent for the premises at 815 Riverside Drive would be increased to $ 7,000. As part of its UMTA financing application, the City procured two additional appraisals of the property. An appraisal by Thacker Watson, MAI, completed on December 6, 1974, valued the land and improvements at $ 715,500. An appraisal by James D. Wigley, MAI, dated January 28, 1975, but effective as of February 26, 1974, valued the property at $ 700,000. Preapplications for UMTA financing were filed with the Georgia Department of Transportation and the Urban Mass Transportation Administration on February 3, 1975, and February 28, 1975, respectively. The actual UMTA application was filed by the City on March 6, 1975. Petitioner was made aware of the pending applications, but an answer was expected before the lapse of the City's Purchase Option. On July 15, 1975, which was after the lapse of the Option, the City Council approved the recommendation of its Finance Committee that the UMTA application be withdrawn. The Council was informed that fulfillment of the conditions required by the Federal Government in order to remain eligible for the *526 grant would necessitate an operating deficit of $ 2 million to $ 2.5 million over the next 5 years, which was larger than the deficit that was expected were the City to operate the system as it wished and forego Federal financing. On February 5, 1974, the Council approved a resolution creating the Authority. Shortly thereafter the Georgia legislature passed legislation creating this body. As part of its duties and powers, the Authority was given the power of eminent domain. The Authority first considered financing the purchase of 815 Riverside Drive at its meeting of August 14, 1975. The remaining $ 582,500, which denotes the original purchase price less the amount paid for the option, was to be financed through the Georgia Band and Trust Company of Macon, Georgia. At a meeting of petitioner's shareholders and Board of Directors on September 12, 1975, the sale of the property to the Authority was approved. The Authority approved the purchase and subsequent lease of the property to the City at its meeting on October 6, 1975. The closing of the purchase took place on October 16, 1975. Concurrently with the signing of the agreement, a lease-purchase agreement was executed by the *527 City and the Authority whereby the City leased the premises from the Authority. During the course of the negotiations between petitioner and the City or the Authority, petitioner and its officers and agents were aware that both the City and the Authority were empowered to condemn the property if necessary. About 3 weeks prior to the closing of the transaction, Lawton Miller was approached by Barnes' attorney, Charles R. Cork, who requested that Miller send Barnes a letter threatening condemnation. Miller refused this request explaining to Cork that no condemnation had been threatened or even seriously contemplated. At the closing, and during the course of making concluding remarks, Mayor Thompson expressed his relief that the transaction could be consummated without the necessity of condemnation. Immediately following the closing, Mayor Thompson was approached by Barnes who requested that the Mayor record his concluding remarks in writing in the form of a letter to Barnes. This was done by Mayor Thompson on October 20, 1975. Several members of the Council had reminded Barnes during the course of negotiations that both the City and the Authority had the power of eminent domain, *528 but Barnes was never told that condemnation was a certainty if petitioner decided not to sell. OPINION Resolution of this case turns upon whether petitioner sold real property located at 815 Riverside Drive, in Macon, Georgia, under threat or imminence of condemnation as described in section 1033. Section 1033(a) provides that when property is sold under threat or imminence of condemnation, no gain shall be recognized if within 2 years the taxpayer purchases other property similar or related in service or use to the property sold. Section 1033(g) provides that when property held for productive use in a trade or business or for investment is compulsorily or involuntary converted, property of a like kind to be similarly held shall be treated as property similar or related in service to the property converted. If the requirements of section 1033 are complied with, recognition of gain on the sale of property is limited to the difference between the amount realized and the cost of replacement property. Sec. 1033(a)(2)(A). This case is similar to Rainer Companies, Inc. v. Commissioner,61 T.C. 68 (1973), revd. on another issue by unpublished order (9th Cir. Nov. 5, 1975). Petitioner *529 has repeatedly referred to the fact that the power of eminent domain was held not only by the City but by the Authority. However, "if mere knowledge that a local government entity possessed the power to condemn an owner's property was sufficient evidence of a threat of condemnation, then few sales of land to the public would fail to qualify under section 1033." Rainier v. Commissioner, supra at 75-76. Were we to find section 1033 applicable under the present circumstances, it would be difficult to imagine when a sale of property to a governmental entity would not qualify. While the relief provisions of section 1033 are to be liberally construed, John Richard Corp. v. Commissioner,46 T.C. 41, 44 (1966), a construction so liberal as that urged upon us by petitioner is not warranted. Although the threat or imminence of condemnation is viewed from the seller's point of view, the test is an objective one and asks whether the taxpayer "might reasonably believe from representations of government agents and from surrounding circumstances that condemnation was likely to take place if he did not sell his property." Rainier v. Commissioner, supra at 76. We find that petitioner could have *530 held no such belief. Several factors enter into our determination that petitioner's property was not threatened with condemnation, nor was condemnation imminent. First of all, although Barnes, Mayor Thompson, and others involved in the transaction testified either at trial or by way of deposition that the term "condemnation" was mentioned, no City official ever admitted mentioning the term himself, and all (except Barnes) agreed that it was not seriously contemplated. Secondly, petitioner's attorney, Charles R. Cork, actually solicited a threat of condemnation from the City attorney, Lawton Miller. There could be no reason why he would have solicited a threat other than in an attempt to gain section 1033 treatment. The most telling proof is contained in petitioner's own documents. It was at the meeting of the shareholders of BTC and petitioner held on May 2, 1974, that petitioner first learned that the City would not comply with its letter of intent, having decided to seek Federal financing for purchase of the property. The corporate minutes reflect that at that meeting, "Mr. Barnes further stated that he did not want to pressure the City because it might result in the City being *531 unwilling to purchase the property at all * * *." Also at that meeting, Barnes summarized the alternatives open to the corporation as explained to him by Cork in the event the property was sold to the City. These included "a sale to the City under threat of condemnation, if City council would agree to threaten condemnation, followed by reinvestment of the proceeds in other real estate within a period of 2 years * * *." (Emphasis added.) Although the transaction was closed on October 16, 1975, the City's letter of intent dated March 27, 1974, is strong evidence that petitioner was willing, if not legally committed, to the sale of the property to the City. The minutes of petitioner's shareholders' meeting on May 2, 1974, are equally strong evidence that the City had made no threat of condemnation before that date; neither is there any evidence that condemnation was imminent. [3] Petitioner owned a piece of property upon which stood improvements which were suitable only for the operation of a bus terminal. Petitioner had lost money while operating a bus line from the property for several years prior to termination of the franchise with the City. Based on petitioner's corporate minutes, *532 we perceive no undesirable consequences attendant upon sale of the property to the City; petitioner was actually desirous of disposing of the property, and the City was the only buyer. Had the City not been able to reach an agreement with petitioner, it is highly unlikely that condemnation proceedings would have been commenced. Georgia law provides that when an entity so authorized seeks to exercise its power of eminent domain, a panel of three "assessors" must be selected; the parties each select one assessor who between them select a third. Ga. Code Ann. section 22-2-40 (1982). Pursuant to a statutory scheme, the assessors hear evidence concerning the value of the subject property and any consequential damage or benefit to any interest not taken. Ga. Code Ann. sections 22-2-62 and 22-2-63 *533 (1982). [4] *534 The City had no less than three appraisals made of the subject property, none of which assigned a value to it of less than $ 700,000. The City had already rejected petitioner's offer of $ 650,000 as too expensive. Given the three appraisals, the City could have presented no evidence at any condemnation proceeding that the property was worth less than a figure which they were unwilling to pay. Finally, since the result of the first appraisal was made known to petitioner no later than the shareholder's meeting of May 2, 1974, petitioner should have been reasonably assured that any condemnation award would have been in excess of the price it had been willing to accept. Under these circumstances, we find no "threat" or "imminence" as those terms are contemplated in section 1033. Therefore, we hold that petitioner is not entitled to defer its gain on the sale of 815 Riverside Drive under section 1033. Because of earlier concessions, Decision will be entered under Rule 155.
Footnotes
1. The deficiency for the fiscal year ending March 31, 1973, is a result of the disallowance of a net operating loss carryback. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. 3. The minutes of the May 2, 1974, shareholders' meeting were among those documents stipulated. Petitioner having failed to introduce any evidence to rebut those inferences raised by the minutes, we assume that any such evidence would have been unfavorable to petitioner's position. See Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513↩ (10th Cir. 1947). 4. In the alternative, the condemnor may seek the appointment of a special master and the parties may proceed under Ga. Code Ann. section 22-2-100, et seq. Either party may appeal the award of the assessors or special master to the superior court of the county where the award is filed, the issue to be tried by a jury. Ga. Code Ann. sections 22-2-80 and 22-22-112↩ (1982).